J-S24045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.L.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 39 WDA 2017 |

Appeal from the Order Entered December 8, 2016
in the Court of Common Pleas of Somerset County
Orphans' Court at No(s):  6 Adoption 2016

BEFORE:   PANELLA, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:               **FILED APRIL 27, 2017**

Appellant, P.S. ("Father"), files this appeal from the order entered December 8, 2016, in the Somerset County Court of Common Pleas by the Honorable Scott P. Bittner, granting the petition of G.L.G. and L.R.G. ("Maternal Grandparents") and involuntarily terminating Father's parental rights to his son, M.L.G. ("Child"), born in June of 2009, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b).[1]  After careful review, we affirm.

The relevant facts and procedural history are as follows:  Child has resided with Maternal Grandparents since birth.   Notes of Testimony

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By the separate order entered the same date, the trial court involuntarily terminated the parental rights of L.G. ("Mother") with respect to Child. Mother did not file an appeal, nor is Mother a party to the instant appeal.

("N.T."), 12/8/16, at 8. Initially, Mother and Father moved in with Maternal Grandparents upon relocation from Pittsburgh prior to Child's birth. *Id.* at 9, 39. After about nine months to one year, in approximately April or May of 2010, Father entered a rehabilitation facility.[2] *Id.* at 9, 24, 30, 39. Mother moved out a couple of weeks later; she was in and out of Maternal Grandparents' residence over the next several years until finally moving out in 2013. *Id.* at 9-11. Child, however, remained with Maternal Grandparents. *Id.* at 9. Of significance, both Mother and Father had substance abuse issues. *Id.* at 25-26, 32, 48.

In 2010, Maternal Grandparents filed for custody of Child and were subsequently granted primary physical custody.[3] *Id.* at 9-10, 40-41. Father did not participate in these proceedings.[4] *Id.* at 42-43. In 2013, Maternal Grandparents sought and were granted a name change as to Child's last name.[5] *Id.* at 11. Mother filed for divorce from Father. *Id.* at 15.

_____

[2] Maternal Grandfather requested Father leave the home. *Id.* at 21. Father received treatment at Twin Lakes Residential Treatment Center and from there was transferred to Eagleville. *Id.* at 39-40.

[3] Father admitted that, pursuant to the custody order, he and Mother were entitled to custodial time and contact with Child if drug-free. *Id.* at 40, 42.

[4] Father indicated he was in Philadelphia when the proceedings took place; however, he did not receive a copy of an order until sometime in 2011 while incarcerated. *Id.* at 42-43. While Mother informed Father of and, therefore, had knowledge of these proceedings, it is unclear if she, in fact, participated.

[5] Child's last name was changed to the maternal last name. *Id.* at 11.

After rehabilitation, Father, unable to return to Maternal Grandparents' home, attempted to establish himself in Philadelphia until he was incarcerated in May 2011.[6]  *Id.* at 40-43.  Upon release in May 2013, Father resided in Lawrence County, approximately two hours from Somerset County where Child and Maternal Grandparents reside, until his re-incarceration in August 2016.  *Id.* at 47, 52.  At the time of the termination hearing, Father was incarcerated at SCI-Camp Hill awaiting classification for State Intermediate Punishment, a program focusing on rehabilitation and community reintegration with a two-year sentence.  *Id.* at 38-39, 49.  If sentenced to State Intermediate Punishment, Father indicated his sentence would conclude on October 17, 2018, although he expected to be released to a halfway house in the summer of 2017.[7]  *Id.* at 48-49.

Father has not seen Child since he entered rehabilitation in 2010 and acknowledged a lack of financial support of Child.  *Id.* at 24, 48.  Subsequent to rehabilitation, he maintained contact with Mother for a period of time.  *Id.* at 20, 40.  During his incarceration, Father sent correspondence to Child in 2012 and 2013.  *Id.* at 42-43.  He additionally called and spoke with Mother, but was unable to speak with Child.  *Id.* at 42, 44.

---

[6] Father testified that just prior to completion of his treatment program, he contacted Maternal Grandparents, who advised Father that he was not welcome back in their home.  *Id.* at 40.

[7] Father was unsure as to his sentence if he was approved for State Intermediate Punishment.  *Id.* at 49.

Over the approximate three-year period from May 2013 to August 2016, during which Father was not incarcerated, Father neither visited with Child, nor exercised his custodial rights, nor sought to modify the custody order to request time with Child.[8] *Id.* at 24-25, 47, 51. While Father referenced a lack of finances to obtain legal representation, he made no inquiries of Legal Aid or the court. *Id.* at 47, 52. After attempted telephone calls to Maternal Grandfather and the involvement of Father's uncle, Father sent Child birthday and holiday cards.[9] Father claims the cards were returned in 2014 and 2015. *Id.* at 45-47. Maternal Grandfather, however, testified that no correspondence was received from Father in the last two to three years and claimed he did not refuse mail from Father. *Id.* at 20-21.

On April 26, 2016, Maternal Grandparents filed a petition to involuntarily terminate Mother and Father's parental rights to Child. The trial court conducted a termination hearing on December 8, 2016. In support thereof, Maternal Grandfather and Grandmother each testified. Father, who was represented by counsel, testified via telephone from SCI-Camp Hill. Mother was not present, but was represented by counsel.[10]

_____

[8] Father testified to contacting the police with regard to his custody order. *Id.* at 45.

[9] Maternal Grandfather acknowledged not taking Father's calls. *Id.* at 20.

[10] The guardian *ad litem* argued in favor of termination of Father's parental rights to Child. *Id.* at 59-60. He additionally submitted a brief in favor of this position on appeal.

Following the hearing, on December 8, 2016, the trial court entered an order involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S. 2511(a)(1), (2), and (b).[11]  On December 30, 2016, Father filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[12]

On appeal, Father raises one issue for our review:

Whether the trial court abused its discretion by granting the petition to involuntarily terminate Father's parental rights under 23 Pa.C.S.[] § 2511(a)(1) and (2) when the evidence did not establish a "settled purpose to relinquish parental rights" or a "refusal to parent" because he maintained efforts to contact the child[] even while incarcerated despite significant obstacles created by [Maternal Grandparents]?

Father's Brief at 5 (unnecessary capitalization omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)].  "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.*  "[A] decision may be reversed for an abuse of discretion only upon demonstration of

---

[11] This order memorialized the decision placed by the court on the record at the conclusion of the hearing.

[12] We note that the trial court's Rule 1925(a)(2)(ii) opinion, dated January 9, 2017 and entered January 11, 2017, referred to the Notes of Testimony of the December 8, 2016 hearing for the rationale for its decision and declined further supplementation.  Trial Court Opinion, 1/11/17, at 1 (unpaginated).

manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

***In re T.S.M.***, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Clear and convincing evidence is defined as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (Pa. 1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (2), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze the court's termination order pursuant to subsections 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first examine the court's termination of Father's parental rights under Section 2511(a)(1). We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed:

[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

*In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (citation omitted).

Further, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super. 2010) (citation omitted). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa.Super. 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely

passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations omitted).

In *In re Adoption of S.P.*, our Supreme Court discussed *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975), and stated:

Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 616 Pa. at 327, 47 A.3d at 828. The Supreme Court continued:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to

- 10 -

completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[**McCray**] at 655 (footnotes and internal quotation marks omitted). . . .

***In re Adoption of S.P., supra.***

In the instant matter, in finding grounds for termination, the trial court

concluded:

Moving on with regard to the natural father, the [c]ourt finds, based on the evidence presented today, that there is clear and convincing evidence that natural father had been living in the home of maternal grandparents with natural mother and the child until May of 2010, when he vacated the maternal grandparents' home to enter drug rehabilitation.

Since that time, the [c]ourt finds that there has not been significant contact between natural father and the child.

The [c]ourt further finds that natural father has not provided any financial support for the child since at least May of 2010.

There is evidence in the record that for a period from 2012 to early 2013, natural father did send letters to the child. Then there is conflicting testimony where natural father indicates he continued sending letters and cards, but that those letters and cards were returned to him.

Conversely, both petitioners testified this morning that after 2013 they did not receive any type of correspondence, be it letters or cards, from natural father from 2013 to the present.

I find the testimony of the petitioners on that subject more credible than the testimony of natural father.

I further find by clear and convincing evidence that for approximately the last one-and-a-half to two years, that there has not been any contact between natural father and child; and

- 11 -

the [c]ourt further finds that in May – specifically, May 17, 2013 – natural father was released from jail and was residing in Lawrence County, Pennsylvania.

From May[] of 2013 to August of 2016, despite being only two hours away from the child, the father, by his own testimony, did not make any attempts to come to Somerset County to see the child. He didn't visit with the child or attempt to visit with the child.

He didn't attempt to exercise his custody rights under the existing custody order, and he did not in any way petition the [c]ourt to expand those custody rights or to enforce the custody order.

Natural father specifically testified that he understood the custody order to allow him to see the child.

Although there was some conflicting testimony from natural father that he had a conversation with the Conemaugh Township Police, and was told that he could not see the child, I don't find that testimony to be credible; and even if natural father didn't have the assistance of an attorney, he certainly could have participated in the custody proceedings in this court by acting pro se and the [c]ourt certainly would have entertained his appearance in the matter and allowed him to participate in those proceedings.

So, I do find that the natural father had avenues available to him to have contact with the child, but yet he failed to exercise those custody rights.

I realize that the natural father was incarcerated for a period of time and that incarceration presents certain obstacles to a parent, that in some ways prevents them from seeing the child; however, an incarcerated parent, under the law, must exercise reasonable efforts to overcome those obstacles to have contact with their child, and I don't find under the testimony presented today that natural father made reasonable efforts to overcome those obstacles or to see his child when he could have done that.

Therefore, I find that there is clear and convincing evidence under [S]ection[] 2511(a)(1) and 2511(a)(2)], and I find that the petitioners have met their burden of proving the requirements of [S]ection 2511(a)(1) and 2511(a)(2)],

presenting grounds for involuntary termination of natural father's parental rights in this matter.

N.T. at 67-69.

In arguing that the trial court erred in finding grounds for the termination of his parental rights Father recognizes his substance abuse and incarceration impeded him from performing parental duties. *Id.* at 14. Father, however, asserts that not only did he maintain contact with Child in 2012 and 2013 while incarcerated, but he attempted to contact Child after his release in 2013 "by making telephone calls to Mother and [Maternal] Grandfather, trying to go through the police to exercise visitation with the Child, and trying to establish contact with the Child through his own uncle." *Id.* at 13-14. Father points to obstacles which thwarted his efforts to maintain contact with Child, such as incarceration, lack of transportation, lack of finances for legal assistance, denial of telephone access, and returned correspondence. *Id.* at 14. Father posits, "[a]ll of these obstacles were reasonably resisted by Father, but he was unable to maintain contact with the Child despite his best efforts and desire to do so." *Id.* at 14-15. Such efforts were, according to Father, contrary to a deliberate purpose of relinquishing parental rights or refusal to parent. *Id.* at 15.

Upon review, we find no reason to disturb the trial court's conclusion and discern no abuse of discretion. Beyond Father's substance abuse and incarceration, the record reveals a lack of support and significant contact between Father and Child from the time Father left Maternal Grandparents' home. N.T. at 24, 48. While Father sent correspondence in 2012 and 2013,

*id.* at 42-43, Maternal Grandfather denied refusing Father's mail and testified that Father has sent no recent correspondence. *Id.* at 20-21.

Moreover, and more critically, from 2013 to 2016, between incarceration periods, Father resided a mere two hours from Child yet failed to visit with and/or exercise any custodial rights to Child, despite acknowledging an order providing such rights. *Id.* at 24-25, 51-52. Likewise, Father failed to file any paperwork to enforce and/or extend these custodial rights. *Id.* at 24-25, 47, 51. Father additionally failed to make any inquiries of Legal Aid or the court. *Id.* at 52. Thus, as the trial court's determinations regarding section 2511(a)(1) are supported by competent, clear and convincing evidence in the record, we find no abuse of discretion. *See In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267; *In re Adoption of T.B.B.,* 835 A.2d at 394. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). *In re B.L.W.*, 843 A.2d at 384. We, therefore, need not address Section 2511(a)(2).

As noted above, after the trial court finds sufficient grounds to warrant termination of the parental rights, it must conduct an analysis under Section 2511(b) to analyze the needs and welfare of the child. *In re L.M.*, 923 A.2d at 511. However, Father did not preserve a challenge related to Section 2511(b) as he failed to raise the issue in the statement of questions involved section of his brief and failed to present argument related thereto in his

brief. As such, we find Father has waived any claim regarding Section 2511(b) and Child's needs and welfare. *See Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). *See also In re Adoption of R.K.Y.*, 72 A.3d 669, 679 n.4 (Pa.Super. 2013), *appeal denied*, 76 A.3d 540 (Pa. 2013) (declining to address Section 2511(b) where not challenged on appeal). Nevertheless, in light of the requisite bifurcated analysis, we review this issue.

In determining whether termination was proper under Section 2511(b), [o]ur Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional

bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in reasoning that termination of Father's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated:

> However, . . . we must move on to an analysis under section 2511 (b), which we must give primary consideration to the developmental, physical, and emotional needs and welfare of the child.
>
> An analysis under section 2511 (b) is clear to the [c]ourt that there is no bond existing between the natural father and the child.
>
> The natural father has not seen the child or had any contact with the child since the child was approximately ten months old, less than one year; and I find that even if there may have been a bond formed in the first year of the child's life between the child and the natural father, that, given the significant passage of time since natural father had any contact with the child, that that bond would have deteriorated.
>
> I also find that the child has clearly formed a bond with the child's maternal grandparents, the petitioners in this matter.
>
> As I indicated earlier, the petitioners have essentially raised the child in their home since he was born. They have provided everything that the child needs to develop both physically and emotionally; and they have met the needs and welfare of the child in every respect.
>
> The child has formed a bond with the petitioners and refers to them as Mom and Poppy; and I further find that the child has formed a bond with his two natural cousins, who in fact live with him in maternal grandparents' home, and based on the testimony, the child views them more as siblings or brothers than he would as first cousins.
>
> I believe it is appropriate to allow the child to continue to foster the relationship that he has formed with his cousins while living in the maternal grandparents' home; and I find that by allowing the child to continue living with his maternal grandparents, that it will promote his best interests and will

provide him with the stability and permanency that he very much needs at the young, tender age of seven years old.

Therefore, based on the clear and convincing evidence before the [c]ourt today, I find it appropriate to enter a decree involuntarily terminating the parental rights of the natural father, and I will execute the proposed order of [c]ourt that has been prepared for that purpose.

N.T. at 69-71.

Here, the record likewise corroborates the trial court's termination order pursuant to Section 2511(b). Despite any potential correspondence, Father has not seen Child since Child was less than one year old. N.T. at 24. Father acknowledged he has not provided any financial support for Child. *Id.* at 48. Moreover, Maternal Grandfather testified that Child does not know who Father is or ask about him. *Id.* at 14-15. Maternal Grandmother likewise indicated that Child does not ask about Father. *Id.* at 28. There is no evidence of the existence of any bond between Father and Child.

Further, Maternal Grandfather testified that Child is doing well both educationally and socially. *Id.* at 14. Evidence was presented of a positive and nurturing relationship between Child and Maternal Grandparents, with whom he has resided his entire life and who are able to provide for his needs. *Id.* at 15-16. Significantly, Child views Maternal Grandparents as his mother and father. *Id.* at 15. Child calls Maternal Grandfather "Mom" and Maternal Grandfather "Poppy." *Id.* at 28. Maternal Grandfather referred to Child as his "sidekick." *Id.* at 23. Additionally, Child has also formed a close bond with his cousins who also reside in Maternal Grandparents' home. *Id.* at 23. Child views his cousins as siblings.

Father admits that it is in Child's best interest for Child to remain with Maternal Grandparents. *Id.* at 47-48. Father stated, "[Child]'s best interest is to be raised by [Maternal Grandparents], at least for the immediate future. I, I can no way provide for him right now, and I am aware of that. Ultimately, I just don't want to be eliminated from his life." *Id.* at 48. Thus, as confirmed by the record, termination of Father's parental rights serves Child's needs and welfare. While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d at 856.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(1) and (b). We, therefore, affirm the order of the trial court.

Order affirmed.

.

- 19 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/27/2017